UNITED STATES of America,
Plaintiff,

v.

Anthony M. GROSSO, Samuel J. Grosso,
Jennie B. Grosso, Joseph Pino,
Defendants.

Crim. A. No. 62-281.

United States District Court
W. D. Pennsylvania.

Jan. 9, 1964.

Gustave Diamond, U. S. Atty., James E. McLaughlin, Pittsburgh, Pa., for Anthony Grosso.

Vincent J. Fuller, Washington, D. C., for Samuel Grosso.

Thomas A. Wadden, Jr., Washington, D. C., for Jennie Grosso and Joseph Pino.

GOURLEY, Chief Judge.

This criminal proceeding presents, through a Motion to Suppress Evidence, many of the complex and intricate questions which arise in law enforcement as to the interpretation of the Constitutions of the United States and Pennsylvania as the provisions thereof relate to arrest, search of premises, and seizure of evidence.

The proceeding also brings into clear focus the problems that law enforcement officers have in bringing to the bar of justice those persons who it is believed are the heads or in control of, directly or indirectly, syndicated lottery or gambling operations.

On one side of the scales or account of justice, the ledger entries show the all-consuming amount of time, effort and dedication to duty involved in the close and careful supervision and investigation of a syndicated lottery operation, the lack of legal training and education of the law enforcement officers, and the lack of close or proper liaison relationship between police officers who enforce the law on the one hand, and the directors of said officers or their supervisors and the legal staff commonly identified as the prosecuting attorney or district attorney's office which does not have the time or opportunity to confer and/or consult with an officer before an arrest is made. On the other side of the ledger are the provisions of the Constitutions of our states, more particularly Pennsylvania in this proceeding, the Constitution of the United States of America, and the requirements which our founding fathers enunciated as to the protection and rights which a resident of this great country should be afforded when accused or required to appear in a Court of the state or the United States to answer charges as to conduct which has been prohibited or made unlawful either by state or federal law.

The Court has reviewed most carefully and meticulously all of the evidence, documentary and oral in nature, has studied and evaluated all authorities cited by the United States of America and the defendants, has made its own independent research, and I must conclude that although the matters involved in the Motion to Suppress are in the "twilight zone" of what is proper or improper, reflected judgment requires the conclusion that the arrests and the evidence secured in the searches and seizures incident to the arrests is, in each instance, sustainable and the Motion to Suppress, in each instance, will be denied.

My mind can reach no other conclusion and I believe if the writers of our Constitution had the facts which exist in this case before them, the Constitution would state that "the provisions of the Constitution shall not be interpreted to mean that the arrests and evidence secured incident thereto are improper or vio-

lative of the Constitution which is this day written."

The evidence which is subject to the Motion to Suppress arises out of two raids by state officers, one of which will be identified as the Jefferson Raid, and the other as the Bethel Park Raid. While each raid naturally involves a different factual situation, many of the constitutional and legal questions which are posed have application to each of the two separate and distinct searches and seizures, the legality of which is now before the Court. However, a legal question is presented in the Bethel Park Raid which is not posed in the Jefferson Raid.

A. *Jefferson Raid—*

Members of the Racket Squad of the City of Pittsburgh had, for some time prior to said raid, been conducting a very extensive and thorough investigation of racket and gambling activity in and around Pittsburgh and Allegheny County, Pennsylvania. On the day of the raid, an experienced member of the Racket Squad, Flynn, who had personally participated in much of the investigation, obtained a search warrant from a Pittsburgh Alderman for the Lovejoy home in Jefferson Borough.

The knowledge which Flynn had as to violations of the state lottery laws, the specific details of the surveillance, and the facts revealed by the surveillance and investigation were stated in the presence of the Alderman while both were participating in a conference in the office of the Director of Public Safety, an official by whom the Alderman was employed as Chief Clerk. Later that day, the same officer appeared before the Alderman in his office in the City of Pittsburgh and signed informations, under oath, charging the commission of the crimes of operating a lottery and conspiracy to operate and maintain a lottery. Each of the

informations was in conclusionary terms. The wording of each of them was in the language of the state wagering statutes and did not set forth any facts as to what the officer swearing out the information had seen, heard, observed or even been told by others. The only facts given or statements made to the Alderman under oath were those which were contained within the information itself. Any facts given or statements made orally to the Alderman or in his presence were not made while Officer Flynn or anyone else was under oath.

B. *Bethel Park Raid—*

Search and arrest warrants were issued by a magistrate for the premises raided and for some of the persons arrested therein. The factual background of this raid is similar to that of the Jefferson Borough Raid in that the only statements made or facts given while under oath before the Justice of the Peace who issued the warrants were those contained in the information sworn to by Leo Flynn who, by this time, was a private citizen and no longer a Pittsburgh Police Officer.

The Justice of the Peace was not told, under oath, orally or in writing, any of the facts of gambling activity by the persons present at the raided premises and arrested therein personally known, or of which trustworthy information had been received, by Mr. Flynn or by William Claney Smith, Esq., an Assistant District Attorney for the County of Allegheny who had, by accident, discovered what has been described as the wagering headquarters allegedly being operated by or for some or all of the defendants in this proceeding.[1]

To facilitate the obtaining of a full, complete and intelligible understanding of the conclusions reached by the Court as to the complex and interrelated legal

1. The evidence of the police officers in this proceeding indicates that the wagering headquarters was moved daily, and that discovery of it, therefore, to a great extent, depended on someone cognizant of the wagering activities and of the people known to be active participants at the higher levels, seeing such a person at a time when the people so involved usually congregate to collect and tabulate the wagers and managing to follow such person to the meeting place.

and factual issues involved in the proceeding, the Court will first discuss the general principles of the law of searches and seizures, and then, as to each issue raised by the facts, will discuss the factual background and the applicable principles of law.

Of the five primary legal questions posed by the factual background of the raids, four are posed in the Jefferson and the Bethel Park Raids, and the fifth is raised solely by the factual background of the Bethel Park Raid and is not posed in the Jefferson Raid.

## GENERAL PRINCIPLES OF LAW

■■ Evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendants' immunity from unreasonable search and seizure under the Fourth Amendment is inadmissible in a federal criminal trial. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). However, federal statutory standards are not applicable unless the search and seizure can be deemed to be a federal or a joint federal and state, rather than a state, search and seizure. See Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927).

■■ While the Fourth Amendment to the Constitution of the United States ordinarily prohibits searches of premises without search warrants, a reasonable search of premises may be conducted without a search warrant where such search is incident to a valid arrest. See Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); United States v. Rabinowitz, 339 U.S. 56, 70 S. Ct. 430, 94 L.Ed. 653 (1950). An arrest warrant is not necessarily required for a valid arrest to be made. The validity of

an arrest without a warrant is determined by state law so long as such state law meets federal constitutional standards. See Ker v. California, supra.

■ To meet said standards the lawfulness of the arrest without warrant must, in turn, have been based upon probable cause, which exists where the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. Ker v. California, supra.

■ The reasonableness of the resulting search and seizure incident to an arrest lawful under state law is determined by federal constitutional standards.[2]

## I. WERE THE WARRANTS ISSUED VALID?

The answer is "no".

*Law*

Article 1, Section 8, of the Constitution of Pennsylvania, P.S., provides:

"The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

The Fourth Amendment of the Constitution of the United States [3] provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

---

2. No contention has been raised by defendants that the searches and seizures subsequent to the arrests were unreasonable in that the area of the search and seizure was too extensive under the circumstances. Nevertheless, the Court has thoroughly reviewed the record and is satisfied that the search and seizure in both of the raids was reasonable under all the circumstances.

3. Whether the Fourth Amendment is applicable in this proceeding because this is a federal prosecution or because the Fourth Amendment is applicable to the activities of state officers through the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961), or for both reasons. the Court will not attempt to determine, since it is clear that, in either case, the

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

■ The Fourth Amendment has been construed to require that affidavits for the issuance of search and arrest warrants must state sufficient facts to permit the impartial Commissioner or issuing magistrate to determine whether probable cause exists. Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933); see Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697 (1960); Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L. Ed.2d 1503 (1958).[4] This is true whether the prosecution be a state or federal one.

### Discussion

■ It appears to the Court that the facts contained in the sworn written informations[5] upon which the warrants were issued are insufficient to enable a magistrate to find the probable cause prerequisite to issuance of a warrant under the Fourth Amendment. The informations are in conclusionary terms, taken from the language of the Pennsylvania lottery statutes.

■ Some contention has been made that while the information may be in conclusionary terms, nevertheless the language used also constitutes a statement of facts. Even if this premise be accepted, the statements contained therein do not contain sufficient facts to enable a magistrate to find probable cause.[6] See Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933); Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927).[7]

Whatever may be the requirements of the Pennsylvania Constitutional provision insofar as requiring that the oath or affirmation be in writing, since in neither of the two raids was anything said under oath other than what was stated in the formal information, any discussion or determination of this question would be superfluous and unnecessary. Furthermore, since it seems quite clear to the Court that the issuance of both the search and arrest warrants did not meet Fourth Amendment standards, the Court will not attempt to determine whether or not Article 1, Section 8, of the Pennsylvania Constitution applies to the issuance of arrest warrants as well as search warrants, a question which appears not to have yet been determined by any Penn-

requirements of the Fourth Amendment are applicable to this proceeding and are so conceded to be by both parties.

4. The Supreme Court does not appear to have determined whether the Fourth Amendment requires a written affidavit, under oath. Since, however, no facts were given or statements made, under oath, except those contained in the written information, the Court need not determine that issue in this proceeding.

5. While an affidavit as such was not made out prior to the issuance of the warrants for the raids, the Court sees no reason why the information sworn to in each case by Leo Flynn could not serve as the affidavit on which the issuing magistrate would issue the warrants.

6. Defendants also contend that the warrants in the Jefferson Raid were invalidly issued since they were not issued by a

neutral and detached magistrate in that the issuing magistrate was regularly employed as Chief Clerk of the Pittsburgh Department of Public Safety, whose officials sought the warrants for the raid, and the magistrate had been consulted about the raid during the course of his duties at the Department. Since the Court has determined that the informations for both of the raids are insufficient on their face, determination of these contentions of defendants is unnecessary and the Court intends to express no indication of its opinion of this contention.

7. The Fourth Amendment requirement of probable cause, applied in Byars and Nathanson to search warrants, is likewise applicable to arrest warrants. Giordenello v. United States, 357 U.S. 480, 485–486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

sylvania appellate court,[8] nor will the Court measure the sufficiency of the facts stated in the informations against the requirements of the Pennsylvania Constitution for the issuance of a warrant.

Accordingly, the Court holds that the warrants issued for both the Jefferson and the Bethel Park Raids were defective because the sworn informations supporting the issuance of the warrants failed to meet the requirements of the Fourth Amendment in that they did not state sufficient facts to permit a finding by an impartial magistrate that probable cause existed for the issuance of the warrants. Therefore, the search and seizure cannot be justified as being pursuant to a valid search warrant or as incident to an arrest pursuant to a valid arrest warrant.[9]

## II. DOES THE INVALIDITY OF THE WARRANTS RENDER THE ENTRY AND SEARCH AND SEIZURE UNLAWFUL, EVEN IF THERE WOULD HAVE BEEN A VALID BASIS FOR ENTRY AND SEARCH AND SEIZURE WITHOUT WARRANT?

The answer is "no".

### Discussion

Defendants rely principally on United States v. Merritt, 293 F.2d 742 (3rd Cir. 1961), wherein entry under authority of a validly issued federal search warrant was held unlawful because not served in the daytime and an attempt to validate the search and seizure as incident to an arrest based on the officers' post-entry observation of defendant committing a felony in their presence failed.

The Court believes that Merritt is distinguishable from this proceeding on the facts, and that it is not authority for a proposition of law different from that which the Court deems controlling here—the intent of officers to rely on invalid warrants does not defeat the right of the Government to demonstrate that no warrant was necessary in order to make the arrest and the resulting search and seizure. See United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 94 L. Ed. 653 (1950) (alternative holding); Stallings v. Splain, 253 U.S. 339, 40 S.Ct. 537, 64 L.Ed. 940 (1920); DiBella v. United States, 284 F.2d 897 (2d Cir. 1960), vacated, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962); Williams v. United States, 273 F.2d 781 (9th Cir. 1959), cert. denied, 362 U.S. 951, 80 S.Ct. 862, 4 L.Ed.2d 868 (1960); United States v. Russian, 192 F.Supp. 183 (D.Conn. 1961); Compare Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L. Ed.2d 1503 (1958).[10]

Nowhere in the Merritt opinion is there any statement or suggestion that if entry was under an invalid warrant, an arrest which could legally be made without a warrant is rendered invalid solely because an attempt was made to enter under a warrant which was later declared invalid.

The Government, in Merritt, apparently attempted to justify the search on the theory, *inter alia*, that the officers entered with a view to interrogation and investigation and that an arrest did not oc-

---

8. A Pennsylvania trial court construed Art. I, § 8, as applicable to arrest warrants as well as to search warrants, and interpreted said provision as requiring a written oath or affirmation. See Kessler v. Hoffman, 9 Dist. 365 (Berks Common Pleas 1899).

9. Some confusion exists as to whether or not an arrest warrant was ever procured for the Jefferson Raid. The Court finds that while the state officers did go to the Lovejoy home in Jefferson Borough intending to arrest as well as to search, they did not procure an arrest warrant.

10. The officers must, of course, have entered with an intent to arrest, an intent which they clearly had in both of the raids involved in this proceeding, and the arrest must have either preceded the search or, possibly, have occurred contemporaneously with the search. Since in both of the raids involved in this proceeding the arrests preceded the searches, no problem is presented as to whether a search occurring contemporaneously with the arrest meets the standards of the Fourth Amendment.

**168**

cur until after they entered the premises and saw defendant therein committing a felony in their presence. The Government did not attempt to argue that the entry into the premises to arrest was based on probable cause to arrest without a warrant. This question not having been raised in the Court of Appeals[11] and, accordingly, of course, not having been determined, and Merritt, therefore, being distinguishable from this proceeding and not governing the result to be reached,[12] the Court holds that the intent of the officers to rely on warrants which were later declared invalid does not defeat the right of the government to demonstrate that no warrant was necessary to make the arrest and that the resulting search and seizure was lawful as incident to a lawful arrest.

## III. WERE THE SEARCHES AND SEIZURES LAWFUL AS INCIDENT TO A LAWFUL ARREST WITHOUT WARRANT?

The answer is "yes".

A. *May police officers under the law of Pennsylvania arrest without a warrant for a misdemeanor when said misdemeanor is not committed in their presence?*

The answer is "yes".

*Law*

■ The government concedes that under the law of Pennsylvania[13] a peace officer ordinarily may arrest for a misde-meanor without a warrant only when said misdemeanor is committed in his presence.[14] However, the government contends that as to that class of offenses relating to the setting up of gaming devices or machines, the Legislature of Pennsylvania, by statutory enactment, Act of March 31, 1860, P.L. 382, § 60, 18 Pa.Stat.Ann. § 1445 (hereinafter sometimes referred to simply as 18 Pa.Stat. Ann. § 1445, § 1445 or 1445) has broadened the power of the peace officers to arrest without a warrant.[15] 18 Pa.Stat. Ann. § 1445 provides, inter alia:

"It shall and may be lawful for any sheriff, constable or other officer of justice, with or without warrant, to seize upon, secure and remove any device or machine of any kind, character or description whatsoever, used and employed for the purposes of unlawful gaming as aforesaid, and to arrest, with or without warrant, any person setting up the same."

■ This statute has been held to apply to the operation of numbers lotteries, Commonwealth ex rel. DiDio v. Baldi, 176 Pa.Super. 119, 106 A.2d 910 (1954); Commonwealth v. Bruno, 176 Pa.Super. 115, 106 A.2d 905 (1954), and would clearly be applicable to the seizure of the type of numbers paraphernalia involved in this proceeding.[16]

■ § 1445 does not purport to indicate that the right to arrest is limited to an offense committed in the view of the officer and the Court does not so read said

---

11. An examination of the file in the Merritt case while it was still in the United States District Court for the Western District of Pennsylvania, of the briefs and the transcript of the arguments before the Court, indicates that the government there did not raise the alternative argument which it is raising here.

12. Defendants also rely on Commonwealth v. Troup, 302 Pa. 246, 153 A. 337 (1931). The arguments pertaining to Merritt are equally applicable to Troup. The Court was not called upon to consider any alternative arguments and did not do so.

13. Whether an arrest is valid is governed by state law so long as such law meets federal constitutional standards. See discussion in section entitled "General Principles of Law" supra.

14. The record is bare of any evidence that the arresting officers saw a misdemeanor being committed in their presence.

15. The Act of March 31, 1860, P.L. 382, is entitled, "An Act To Consolidate, Revise, and Amend the Penal Laws of this Commonwealth."

16. The contention of defendants that § 1445 is inapplicable to the arrests in question in that it is essentially a provision for civil forfeiture proceedings of gambling paraphernalia is without merit.

statutory provision.[17] Accordingly, under Pennsylvania law, by virtue of § 1445, an arrest without warrant of any person operating a numbers lottery is valid even though not committed in the view or presence of the arresting officer, and the arrests in question were certainly arrests for operating a numbers lottery.

However, defendants contend that § 1445 has been repealed by the Act of June 24, 1939, P.L. 872, § 1201, 18 Pa. Stat.Ann. § 5201 (hereinafter sometimes referred to as § 5201 or 5201), which provides, *inter alia:* [18]

> "The following acts and parts of acts, and their amendments, are hereby repealed absolutely, except in so far as the same * * * (d) relate to search and seizure * * *: * * * The act, approved the thirty-first day of March, one thousand eight hundred sixty (Pamphlet Laws, three hundred eighty-two), entitled "An Act to Consolidate, Revise and Amend the Penal Laws of this Commonwealth."

Since § 1445 is § 60 of said Act, it would ordinarily have been repealed by the enactment of § 5201. However, the government contends that § 1445 has been saved from repeal by the exceptions from repeal contained with § 5201.

▆▆▆ The Pennsylvania courts have determined that the search and seizure provisions of § 1445 were not repealed by § 5201. Commonwealth v. Bruno, 176 Pa. Super. 115, 106 A.2d 905 (1954); Schuettler v. Maurer, 159 Pa.Super. 110, 46 A. 2d 586 (1946); Petition of Potter Title and Trust Company, 157 Pa.Super. 254, 42 A.2d 456 (1945). Since, however, no Pennsylvania appellate court has specif-ically decided the question of whether or not § 5201 repealed the arrest provisions of § 1445, the question facing the Court is one of first impression which the Court must decide as it believes the appellate courts of Pennsylvania would decide the issue were it facing them. See Gerr v. Emrick, 283 F.2d 293 (3rd Cir. 1960); Eckman v. Baker, 224 F.2d 954 (3rd Cir. 1955).[19]

▆▆▆ In the opinion of the Court, § 5201 did not repeal the arrest provisions of § 1445. As the Court reads § 5201, when it speaks of repealing certain acts, except insofar as the same "relate to search and seizure," same "relate to search and seizure" can only refer to an act or a section or a subsection thereof, whichever may be the applicable unit, as a whole and not to a portion thereof. Search and seizure provisions and the arrest provisions on which the government relies are contained in the same sentence of, obviously, the same section, § 1445.

Based on my legislative experience, having been a member of the Senate of Pennsylvania during the years 1942 through 1945, I cannot conceive that the Legislature of Pennsylvania intended to repeal part of § 1445 while retaining the remaining portions thereof. The Court reads § 5201 as saving all portions of any section which relate to searches and seizures. § 1445 is such a section and accordingly has not been repealed by § 5201.

B. *Does an arrest without a warrant for a misdemeanor not committed in the presence of the arresting officer meet federal constitutional standards?*

The answer is "yes".

---

17. The research of counsel for the parties and the independent research of the Court has revealed no Pennsylvania appellate court cases which have determined this issue. A Pennsylvania trial court has taken a view contrary to that reached by the Court. See Commonwealth v. Battipaglia, 19 Camb.L.J. 30 (Philadelphia Quarter Sessions 1953).

18. The Act of June 24, 1939, P.L. 872, § 1201, 18 Pa.Stat.Ann. § 5201, is entitled,

"An Act to consolidate, amend and revise the penal laws of the Commonwealth."

19. The same Pennsylvania trial court which held that the offense must have been committed within the view of the arresting officer for an arrest to be legal under § 1445 has also held that § 1445 was not repealed by § 5201. See Commonwealth v. Battipaglia, supra note 17.

### Discussion

▮ Defendants contend that to allow an arrest without warrant for a misdemeanor not committed in view of the arresting officer creates doubt as to the constitutionality of § 1445 in that § 1445 would then be legalizing a search and seizure without warrant solely by what the search turns up. This contention is without merit. § 1445 must be read as authorizing an arrest without warrant only when the arrest is based on probable cause to believe that an offense has been or is being committed. When so based on probable cause, the arrest is legal when made and is not legalized, as defendants contend, by what evidence a subsequent search reveals. As so interpreted, 18 Pa.Stat.Ann. § 1445 clearly meets federal constitutional standards.

C. *Was the search and seizure preceded by the arrest and did the arresting officers enter with the purpose of arrest?*

The answer to both questions is "yes".

### Discussion

▮ The Court finds as a fact that the arrest in each of the two raids occurred immediately upon the entrance of the officers into the home, the searches and seizures occurred subsequent to the arrests, and the officers entered each of the homes in order to arrest.

D. *Did the arresting officers have probable cause to believe that an offense had been or was being committed?*

The answer is "yes".

### Discussion

▮ Since no contention has been made by the defendants in their brief that the arresting officers did not have probable cause to arrest without warrants, a simple finding that the arresting officers did have probable cause might suffice. Nevertheless, the Court will explain the reasons for reaching its determination.

The issue in both raids is complicated by the fact that some of the persons participating in the raid were private citizens and, as such, do not come within the terms of § 1445 which only applies to a "sheriff, constable, or other officers of justice."

(1) Jefferson Raid—

There can be no doubt that Officer Flynn, and probably Officer John James of the Pittsburgh Police Department, each had probable cause to believe that persons within the Lovejoy home in Jefferson Borough, Allegheny County, had committed and were committing an offense. Unfortunately for the government's position, the Lovejoy home was not located in Pittsburgh and, therefore, the participation of each in the raid was as a private citizen and not as an "officer of justice".

However, one participant in the raid does qualify under the terms of § 1445. Allegheny County Detective Botula had jurisdiction to arrest anywhere in Allegheny County and qualified as an "officer of justice" while arresting in Jefferson Borough.

Allegheny County Detective Botula also had probable cause to arrest. While he knew nothing of the surveillance and the investigation before the day of the raid, prior to entering the home to arrest he had been told by Flynn and James the facts which they themselves knew as the result of the prior surveillance and investigation they and their fellow Pittsburgh Police Officers had conducted of the activities in the Lovejoy home and of the persons arrested therein. This knowledge, coupled with Detective Botula's belief that the Pittsburgh officers were reliable informants and the status of the informants as police officers, certainly constitutes probable cause. Additionally, the activities in the home, after the raiders had knocked,[20] provided some

20. The occurrences involved in executing the invalid warrants are discussed more fully in Section IV, infra, on the legality of the entrance into the home to arrest.

corroboration of the facts which had been told Detective Botula, but even without that, he had probable cause to arrest.

### (2) Bethel Park Raid—

Again there can be no question but that Leo Flynn, by this time a private citizen but still retaining his contacts in the Pittsburgh Police Department, and William Claney Smith, Esq., Allegheny County Assistant District Attorney, each had probable cause to arrest. However, as the Court interprets § 1445, neither one qualifies as an "officer of justice," and the arrests can be justified only if Constable Hasley or Deputy Constable Hieronimus, each of whom had jurisdiction to arrest in Bethel Park, had probable cause to arrest without a warrant. The Court finds that each of them had such probable cause. Deputy Constable Hieronimus was present throughout the time Mr. Flynn and Attorney Smith were telling the facts of the past surveillances, of Smith's discovery of the headquarters and of their background knowledge and information to the Justice of the Peace. While the evidence indicates that Constable Hasley was absent for a short time while the facts were being stated to Justice of the Peace Hubbard, the Court, nevertheless, finds that Constable Hasley heard enough of the factual background to have had probable cause to arrest. Furthermore, Flynn gave the two Constables further information while they were driving to the raid in Flynn's car. This factual information, when coupled with Constable Hasley's belief that the informants were reliable and the knowledge of both constables of the status of one as a former police officer and the other as an Assistant District Attorney, certainly constitutes probable cause to arrest for each of the constables. Additionally, the occurrences in the house [21] tend to corroborate the facts given to the constables and reinforce the existence of probable cause on the part of the two constables, although probable cause existed even without these corroborative occurrences.

## IV. DID THE BREAKING OF THE DOORS OF PRIVATE HOMES VITIATE WHAT WAS OTHERWISE A LAWFUL ARREST?

The answer is "no".

A. *Does breaking doors of a private home in order to arrest without a warrant for a misdemeanor not committed in the presence of the arresting officer in and of itself violate the Fourth Amendment?*

The answer is "no".

### Discussion

Defendants rely on two cases in support of their contention that an opposite conclusion is required. Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F.2d 690 (D.C.Cir. 1940). Both cases are distinguishable and reliance on them is misapplied.

B. *Does breaking into a private dwelling to arrest without a warrant for a misdemeanor not committed in the officer's presence violate Pennsylvania law?*

The answer is "no".

### Discussion

Since the breaking into the house is part of the arrest process, the effect to be given, in determining the legality of an arrest, to the breaking in is determined by Pennsylvania law so long as Federal Constitutional standards are met.[22] Although some Pennsylvania cases on this issue have been cited by both parties, no Pennsylvania appellate court appears to have decided the issue before the Court, and the trial court cases do not indicate any consensus of opinion helpful to the Court in determining the

---

21. These are discussed more fully in the discussion on the method of effectuating the arrests. See Section IV infra.

22. See the discussion on the applicability of the state law of arrest in the section of this Opinion entitled "General Principles of Law" supra.

applicable Pennsylvania law.[23] The Court considers the question an open one to be determined in the light of reason, common sense, and any legislative intention evident in § 1445.

Applying these criteria to the issue, the Court can only conclude that an arrest without a warrant subsequent to breaking into a private dwelling in order to arrest a person for operating a numbers lottery, even though the offense is not committed in the officer's presence, is legal and valid. To hold otherwise would be to sanction avoidance of the consequences of § 1445 and the other gambling statutes by the simple device of refusing to answer the door not only when the officers are coming to arrest without a warrant under § 1445, but also when officers come to execute a search or arrest warrant.[24]

The Court cannot believe that the appellate courts of Pennsylvania would sanction such a result and believes that they would hold that breaking in to arrest without a warrant a person for operating a numbers lottery is permissible, even though said offense is not committed in the officer's presence.

C. *Did the specific circumstances of the entry into the two homes violate any federal constitutional standards or in any way violate state law?*

The answer is "no".

### Facts

(1) Jefferson Raid—

Pittsburgh Police Officers Flynn and James and Allegheny County Detective Botula, all three in plain clothes, approached the house and went to the door. The outer door which was a storm door with windows in it was locked. The inner door which was made of solid wood was unlocked and partly open. The officers could see inside and could be seen by those inside the house, when those inside and outside were at the proper angle. The arresting officers knocked on the door of the premises. There was scurrying, running, and commotion in the house. Persons inside yelled, "It's the cops." A minute after the knocking, the three officers broke into the home and arrested those within.

(2) Bethel Park Raid—

The raiding party was composed of Constable Hasley, Deputy Constable Hieronimus, former Pittsburgh Police Officer Leo Flynn and Assistant District Attorney Smith. Internal Revenue Agent Madden was also present.[25] The party approached the front door. Constable Hasley knocked. They heard noises—rumbling, walking and running around, and the moving of different things around. A cry of "It is the cops" was heard. Meanwhile, Flynn and Hasley had gone to the cellar door. Finding it unlocked, they raised the door and entered the garage, going from there into an adjoining basement. While entering into the basement, they announced their status as police officers and their purpose to arrest.

### Discussion

In their briefs, defendants do not contend that the specific method and facts of the entry were unreasonable under the circumstances and thus violate state law or federal constitutional standards. Instead, they appear to rely solely on the contention that an officer may not break

23. Commonwealth v. Truitt, 369 Pa. 72, 85 A.2d 425 (1951) (concurring opinion) (dictum); Commonwealth v. Manduchi, 58 Lancaster L.Rev. 54 (1962) (search warrant); Commonwealth v. Whitebread, 52 Luzerne 81 (1962); Commonwealth v. Krubeck, 8 Dist. 521 (Quarter Sessions, Philadelphia 1899); Commonwealth ex rel. Volpe v. Superintendent of County Prison, 5 Dist. 635 (Quarter Sessions, Philadelphia 1896).

24. So long as arrests are permitted without warrants, no differentiation based on the existence of a warrant would appear to be valid when the question of permitting breaking of doors is the issue.

25. For a fuller discussion of the role played by I.R.S. Agent Madden, see the discussion of the effect of his participation in Section V infra.

doors of a private home to arrest for a misdemeanor. Under these circumstances, the Court could well find, and does find, that this defense to the extent raised during the hearing has been abandoned. Nevertheless, the Court will make a specific finding as to the reasonableness and legality of the method of entry, under all the facts and circumstances of this particular case.

Under the circumstances of each of these raids—Jefferson and Bethel Park—the "officers of Justice," under 18 Pa. Stat.Ann. § 1445, and the private persons assisting them had reason to believe that the persons inside knew the identity and purpose of the officers and that if they delayed making their entry the wagering paraphernalia which they clearly had probable cause to believe was inside would be destroyed.

The leading case on the vitiation of an otherwise lawful arrest by the method of entry to arrest is Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), which was a state prosecution wherein the entry having been held legal under the state law by the state courts, the legality of the method of entering the home was then measured by federal constitutional standards of reasonableness.[26] After a meticulous comparison of the facts in this proceeding and the facts in Ker, the Court determines that the method of entry in this proceeding meets the constitutional standards of reasonableness set forth in Ker.

As to the vitiating effects of the method of entry on the legality of the arrest under state law, no cases have been cited to the Court wherein this specific question has been raised. It is the opinion of the Court that, breaking in to arrest without a warrant for operating a numbers lottery being permissible under state law,[27] the courts of Pennsylvania would determine that nothing in the facts of this case would violate Pennsylvania law and vitiate an otherwise legal arrest.

## V. WAS THE PARTICIPATION OF INTERNAL REVENUE SERVICE AGENT MADDEN IN THE BETHEL PARK RAID SUCH AS TO MAKE FEDERAL STATUTORY AS WELL AS CONSTITUTIONAL STANDARDS APPLICABLE TO SAID RAID?

The answer is "no".

### Discussion

Defendants rely on the case of Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927), to support their contention that this raid must be deemed a federal raid and that, therefore, federal statutory standards are applicable. The Court in Byars indicated that mere participation in a state search by a federal officer does not render it a federal undertaking and that whether the participation was sufficient to render the state search a federal one depends upon the peculiar facts of each raid.[28]

A comparison of the factual setting in Byars and in the instant case indicates that the two cases are distinguishable and that Byars is inapplicable to this proceeding. In Byars the federal agent not only entered the premises but actually searched a particular room therein and discovered some evidence. In this proceeding, the federal agent was not invited to attend by a police official of the state, but was invited to attend by Mr. Flynn, a private citizen. Refused permission to participate in the raid by his superiors, federal agent Madden was advised that he could go along on the raid as an observer, which he did.

---

26. Federal constitutional rather than statutory standards are applied in federal prosecutions wherein the evidence was seized by state officers. See Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

27. For the discussion of the applicable Pennsylvania law on this point, see discussion in IV(B) of this Opinion.

28. No contention has been made, as none could be, that this state raid was being conducted for the federal government by state officers.

Contrary to the situation in Byars, Internal Revenue Service Agent Madden did not enter the premises nor did he participate in the search. However, he did, by his own admission, work as a guard at the rear door, even though he had no authority to do so and did not claim any compensation of the federal government for his activities on that day or for the twenty-two miles recorded on his personal automobile during that time.[29] Under all the facts and circumstances, the Court is of the opinion that the participation of Internal Revenue Service Agent Madden in the Bethel Park Raid did not make the raid a federal, or a joint federal and state raid, but that the raid remained a state raid, and that, therefore, federal statutory standards are inapplicable.

Furthermore, if Byars is read as requiring participation in the search, rather than merely in the raid, by the federal agent in order that the full panoply of federal law be applicable, then this proceeding is clearly distinguishable from Byars on the facts, since there is no doubt in the Court's mind that Agent Madden did not participate in the search.

While the Court does not so read Byars, said case might also be read as making the test of the applicability of the full panoply of federal law to be whether the participation of the agent in the search was under color of his federal office. Even if such were the test, federal statutory law, more particularly 18 U.S.C.A. § 3109, on which defendants rely, is not applicable in this proceeding. After due consideration of all the facts and circumstances of the raid and of the role of Agent Madden in it, the Court finds as a fact that said agent did not participate in the raid under color of his federal office.

For all of these reasons, the Court concludes that federal statutory standards were not applicable to the raid.

## VI. CONCLUSION

Federal statutory standards being inapplicable to each of the two raids, and the Court concluding that, under state law and federal constitutional law, the searches and seizures in each of the raids were reasonable under all the facts and circumstances and were legal and valid as incident to a lawful arrest based on probable cause, it is the considered opinion of the Court that in regard to the items of evidence described in Paragraphs 3 and 25 of Defendants' Motion for Suppression of Evidence, said Motion should be denied.

Statements of fact and conclusions of law contained within this Opinion are adopted as Findings of Fact and Conclusions of Law.

An appropriate Order is entered.

## OPINION ON MOTION TO DISMISS INDICTMENT

In this criminal proceeding, defendants have filed a Motion to Dismiss Indictment, Motion for Suppression of Evidence and Motion for Bill of Particulars Ancillary to Motion to Suppress. By prior Order of Court, by agreement and stipulation of the parties, approved by the Court, and by Opinion and Order entered contemporaneously herewith this Opinion and Order, the Court has disposed of the Motions for Suppression of Evidence and for Bill of Particulars Ancillary to Motion to Suppress. It is the considered opinion of the Court that the Motion to Dismiss Indictment should be denied.

Defendants contend that each count of the indictment should be dismissed on the grounds that evidence which is the basis for the indictment was procured illegally. This contention has no merit. The Court has determined that the evidence described in Paragraphs 1, 3, 10, 15, 20, 21, 23, 24 and 25 of defendants' Motion for Suppression of Evidence

---

29. The entry in Agent Madden's diary for that date reads, "Worked with Leo Flynn and W. C. Smith as an observer in raid at Betz, 110 Criss St., Bethel Park. I worked as guard at rear door—did not enter house. 2 hours worked. No compensation time claimed. Mileage of 22 miles not claimed."

was legally seized and defendants have withdrawn said Motion as to those items enumerated in Paragraphs 2, 6, 7, 11, 19 and 22 of said Motion. Certainly, any count of the indictment whose basis was the evidence enumerated in any of said Paragraphs of the Motion for Suppression is not open to attack on the ground of being based on illegally obtained evidence. As to the counts of the indictment based on the evidence enumerated in Paragraphs 4, 5, 8, 9, 12, 13, 14, 16, 17, 18, 26 and 27 of said Motion for Suppression of Evidence which the government, without conceding such evidence was obtained as a result of an illegal search and seizure, has agreed not to introduce into evidence, it is the opinion of the Court that basing a count of an indictment on illegally obtained evidence is akin to basing such count on hearsay, which clearly is permissible. See Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Therefore, even if the evidence enumerated in Paragraphs 4, 5, 8, 9, 12, 13, 14, 16, 17, 18, 26 and 27 were illegally obtained, a question which the Court expressly does not determine, the use of such illegally obtained evidence is irrelevant where the issue facing the Court is whether a count of an indictment should be dismissed.

▇ Defendants also contend that Counts 1 through 19 should be dismissed on the ground that payment in the required manner of the ten per cent wagering excise tax allegedly due and owing by the defendants named in each of such counts would have entailed a violation of the constitutional privilege against compulsory self-incrimination, in that such payment would have tended to incriminate the defendants under both federal and state statutes.

In the opinion of the Court the legal issues raised by this contention are of no merit, having, in effect, already been determined adversely to defendants' position by the Court of Appeals. See United States v. Joseph, 278 F.2d 504 (3rd Cir. 1960); cf. Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955); United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953).

### Conclusion

Since neither of defendants' arguments for dismissing the indictment is meritorious, the Motion to Dismiss Indictment should be denied.

An appropriate Order is entered.